COCA-COLA BOTTLING COMPANY OF SHREVEPORT, INC., et al., Plaintiffs,

v.

The COCA-COLA COMPANY, a Delaware corporation, Defendant.

ALEXANDRIA COCA-COLA BOTTLING COMPANY, LTD., et al., Plaintiffs,

v.

The COCA-COLA COMPANY, a Delaware corporation, Defendant.

Civ. A. No. 83-95 MMS, Civ. A. No. 83-120 MMS.

United States District Court, D. Delaware.

May 23, 1986.

Edmund N. Carpenter, II, Charles F. Richards, Jr., and Jesse A. Finkelstein of Richards, Layton & Finger, Wilmington, Del.; of counsel: Emmet J. Bondurant, and Jane F. Vehko of Bondurant, Mixson & Elmore, Atlanta, Ga.; Miles J. Alexander, and Jerre B. Swan of Kilpatrick & Cody, Atlanta, Ga.; Charles S. Weems of Gold, Little, Simon, Weems & Bruser, Alexandria, La.; J. Barry Epperson of Epperson, Goodpaster & Johnson, Tulsa, Okl.; Roger N. Nanovic, Jim Thorpe, Pa.; M.B. Jackson of MacDonald, Halstead & Laybourne, Los Angeles, Cal.; for plaintiffs.

Andrew B. Kirkpatrick, Jr., William O. LaMotte, III, and Richard D. Allen of Morris, Nichols, Arsht & Tunnell, Wilmington, Del.; of counsel: Frank C. Jones, Michael

. C. Russ, and George S. Branch of King & Spalding, Atlanta, Ga.; for defendant.

## OPINION

### MURRAY M. SCHWARTZ, Chief Judge.

Two groups of bottlers of Coca-Cola products ("the Bottlers") have brought suit against the Coca-Cola Company ("the Company") under various theories, seeking declaratory judgments, injunctive relief, and damages.[1] In brief, the Bottlers contend the Company is obligated to sell them the syrup used in the bottling of diet Coke under the terms of their existing contracts for Coca-Cola Bottler's Syrup.[2] On August 20, 1985, this Court granted plaintiffs' motion to compel production of certain formulae and taste-test results, subject to an agreed-upon protective order. *See Coca-Cola Bottling Co. v. Coca-Cola Co.,* 107 F.R.D. 288 (D.Del.1985). Defendant has refused to comply with the discovery order as it pertains to the formulae. Presently before the Court is plaintiffs' motion for sanctions.

### Background

The extended history of these cases has been set out in several opinions and need not be repeated here. *See, e.g., id.* (hereinafter *"Coke III "*); *Alexandria Coca-Cola Bottling Co. v. Coca-Cola Co.,* 637 F.Supp. 1220 (D.Del.1984) (summary judgment opinion; amended bottlers) (hereinafter *"Coke II"*); *Coca-Cola Bottling Co. v. Coca-Cola Co.,* 563 F.Supp. 1122 (D.Del.1983) (prelimi-

nary injunction opinion) (hereinafter *"Coke I"*). The Court's order dated August 20, 1985 granted plaintiffs' motion to compel with respect to the complete formulae for old Coca-Cola,[3] new Coca-Cola, diet Coke, caffeine-free Coke, experimental low-calorie colas based on the Coca-Cola formulae or related to the development of diet Coke (including the experimental low-calorie cola tested in 1978), as well as data from the Company's taste tests between caffeine-free Coke and Coca-Cola.[4] Dkt. 245 (83–95), Dkt. 178 (83–120). The disclosure order was stayed pending entry of a new protective order governing disclosure of the information. *Id.* The Court directed the parties to negotiate and submit that protective order within twenty days. *Coke III,* 107 F.R.D. at 300.

By letter dated September 9, 1985, counsel for the Company informed the Court that the Company would not disclose its formulae, "[i]n light of the overriding commercial importance of the secrecy of formulae to the entire Coca-Cola system, ... even under the terms of a stringent protective order...." [5] The Company acknowledged the Court "may order ... a sanction" for that refusal, and requested an opportunity to be heard on the sanctions issue.[6]

Plaintiffs moved for the entry of an order under Fed.R.Civ.P. 37(b)(2)(C) striking the Company's answer and entering judgment in favor of plaintiffs on Counts One

**1.** Plaintiffs in 83–95 (hereinafter "the unamended bottlers") purchase Coca-Cola Bottler's Syrup from the Company under terms essentially established by consent decrees entered into following litigation in 1921. Plaintiffs in 83–120 (hereinafter "the amended bottlers") are among the majority of bottlers which agreed in 1978 to purchase Bottler's Syrup under a new pricing formula.

**2.** The term "Coca-Cola Bottler's Syrup" is used here and in the accompanying Order to refer to the contract term, variously phrased by the parties and in previous opinions, at issue in this litigation.

**3.** The term "old Coca-Cola," or "old Coke," refers to Coca-Cola sold when diet Coke was introduced. "Old Coke" is now marketed as Coca-

Cola Classic. "New Coke" refers to the product sold under the Coca-Cola label since April 23, 1985. This Opinion will use the terms "Coca-Cola" and "Coke" interchangeably.

**4.** The Court denied the motion as to the formulae for caffeine-free diet Coke, TAB, and experimental cola beverages that were not low-calorie. *Coke III,* 107 F.R.D. at 300.

**5.** Letter from William O. LaMotte, III, Counsel for Defendant, to Court (Sept. 9, 1985). The letter stated the Company was willing to disclose under the existing protective order the taste-test data called for in the disclosure order. Following oral argument, the parties confirmed the data had been disclosed.

**6.** *Id.*

and Two in the action brought by the un-amended bottlers (83–95) and Counts One, Two, and Three in the action brought by the amended bottlers (83–120).[7] In addition, they moved for expenses and attorney's fees. Defendant contended a limited preclusion order is the proper sanction and argued the award of expenses and attorney's fees is unwarranted.

At oral argument on February 14, 1986, following briefing on the motion, the Court asked the parties to attempt to agree on a preclusion order. The governing principle was that the preclusion order must in no way prejudice plaintiffs and in no way benefit defendant. The parties failed to agree on a preclusion order and submitted their differing proposals to the Court. The matter is now ripe for decision.

### Discussion

Rule 37(b) of the Federal Rules of Civil Procedure governs the Court's disposition of plaintiffs' motion. The Rule provides that if a party fails to obey an order to provide or permit discovery, the court "may make such orders in regard to the failure as are just...." While the specific options set out in the Rule are not exclusive, the Court may issue:

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;

(C) An order striking out pleadings or parts thereof, or staying further proceed-

ings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

(D) In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination;

Fed.R.Civ.P. 37(b)(2)(A)–(D). With respect to expenses and attorney's fees, Rule 37(b)(2) states:

In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

■■■ Whether to impose sanctions and what sanctions to impose are matters generally entrusted to the discretion of the district court. *See id; National Hockey League v. Metropolitan Hockey Club,* 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976) (per curiam); *Transportes Aereos de Angola v. Ronair, Inc.,* 104 F.R.D. 482, 499 (D.Del.1985). Two standards—one general and one specific— nevertheless limit the Court's discretion. *Insurance Corp. v. Compagnie des Bauxites,* 456 U.S. 694, 707, 102 S.Ct. 2099, 2106, 72 L.Ed.2d 492 (1982). The sanction must be "just" and must be "specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Id.; Transportes Aereos,* 104 F.R.D. at 499.

---

**7.** In the complaint filed by the unamended bottlers, Count One alleges the Company breached the provisions of each plaintiff's First-Line Bottler's Contract; Count Two alleges violations of the 1921 consent decrees. Dkt. 1 (83–95). In the complaint filed by the amended bottlers, Count One alleges the Company breached each plaintiff's amended contract; Count Two alleges breach of each plaintiff's First-Line Coca-Cola Bottler's Contract as amended; Count Three al-

leges violation of rights under the 1921 consent decrees. Dkt. 1 (83–120).

Default judgment on Count Three in 83–95 was not requested in plaintiffs' motion, but was sought in their briefs and at oral argument. While not necessary in light of the Court's conclusion in this Opinion, the Court will consider that Count as included within the motion as filed.

*Substantive Sanctions*

 The Third Circuit Court of Appeals has emphasized the "extreme nature" of a default judgment. *See Poulis v. State Farm Fire & Casualty Co.*, 747 F.2d 863, 867 (3d Cir.1984) (and cases cited).[8] It is a sanction of last resort. *Id.* The *Poulis* court set out six specific factors to be considered by the district courts in determining whether default should be entered under Rule 37(b):

> (1) the extent of the *party's* personal *responsibility;* (2) the *prejudice* to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a *history* of dilatoriness; (4) whether the conduct of the party or the attorney was *willful* or in *bad faith;* (5) the effectiveness of sanctions other than dismissal, which entails an analysis of *alternative sanctions;* and (6) the *meritoriousness* of the claim or defense.

*Id.* at 868, 870 (emphasis in original). *See also Ennis v. New Jersey Bell Telephone Co.*, 782 F.2d 396 (3d Cir.1985) (applying *Poulis* factors), *cert. denied,* —— U.S. ——, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986); *Scarborough v. Eubanks*, 747 F.2d 871 (3d Cir.1984) (same); *Ali v. Sims*, 788 F.2d 954 (3d Cir.1986) (same); *George V. Hamilton, Inc. v. Everett Co.*, 104 F.R.D. 106 (W.D. Pa.1985) (same).

 Two important *Poulis* factors point forcefully in favor of entering a default judgment in this instance.[9] The Company was fully responsible for the decision to disobey the order[10] and its failure to comply was willful.[11]

 Other factors, however, counsel restraint. Defendant has raised facially meritorious defenses to plaintiffs' claims.[12]

---

**8.** *But see National Hockey League,* 427 U.S. at 643, 96 S.Ct. at 2781:

> But here, as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.

**9.** It is not necessary that each of the *Poulis* factors point toward dismissal. In *Poulis* itself, the Court of Appeals upheld a dismissal despite finding that counsel, not the party, was responsible for the violation. In addition, the appellate court questioned the trial court's finding of willfulness and concluded that alternative sanctions existed. *See* 747 F.2d at 868–69. It is clear that the *Poulis* court, which applied an "abuse of discretion" review of the district court's order, would have preferred the use of less drastic sanctions. *Id.* at 869, 870. The existence of effective alternative sanctions is of central importance in determining in the first instance whether to enter a default judgment under Rule 37(b). *Id.; see also In re MacMeekin*, 722 F.2d 32, 35 (3d Cir.1983).

**10.** *See, e.g.,* Affidavit of Roberto C. Goizueta, Defendant's Brief in Opposition, Dkt. 188 (83–120), Dkt. 262 (83–95), at Ex. A; Second Affidavit of Donald R. Keough, *id.* at Ex. B; Letter, *supra* note 5.

**11.** *See* statements cited in *supra* note 10. The Company's business justifications for its refusal to comply with the disclosure order, along with any tactical motivations in this litigation, may have some bearing on a finding of bad faith but in no way suggest that the disobedience was not willful. This is not an instance where the party was unable to comply with the order. *Cf. Societe Internationale,* 357 U.S. 197 at 212, 78 S.Ct. 1087 at 1095, 2 L.Ed.2d 1255 (production could violate foreign law). The Company has made no indication since its letter of September 9 that it would be willing to comply with the disclosure order.

In *Scarborough,* decided the same day as *Poulis,* the Court of Appeals recited this factor as whether the conduct "was willful *and* in bad faith." 747 F.2d at 875 (emphasis added). *Ennis,* 782 F.2d at 398, *Ali,* 957, and *Hamilton,* 104 F.R.D. at 110, however, suggest like *Poulis* that a finding of either willfulness *or* bad faith satisfies this factor. In any event, the Court's decision not to impose a default judgment in this case makes further consideration of this issue unnecessary.

**12.** The Court is to evaluate the meritoriousness of the claims or defenses of the offending party. *See Poulis,* 747 F.2d at 867–70; *Ennis,* 782 F.2d at 399; *Scarborough,* 747 F.2d at 875; *Hamilton,* 104 F.R.D. at 111. In the present cases, the Court has already held that, given the absence of sugar in diet Coke, the unamended bottlers have failed to demonstrate a probability of success on the merits with respect to their contract claims. *Coke I,* 563 F.Supp. at 1134–36. Neither the amended nor unamended bottlers demonstrated a probability of success on the merits based upon asserted trademark rights. *Id.* at 1136–39. The Court has also denied a summary judgment motion by the amended bottlers. *Coke II,* 637 F.Supp. 1220. Thus, even though

Except for the delay associated with the instant matter, plaintiffs have not alleged a history of dilatoriness by defendant.[13] Prejudice to plaintiffs due to defendant's noncompliance, while now substantial, can be remedied.[14] Most importantly, effective alternative sanctions exist. Mindful that it must carefully tailor its sanction to fit the situation presented, *Transportes Aereos,* 104 F.R.D. at 499, the Court will not enter a default judgment. *See Scarborough,* 747 F.2d at 878 ("doubts should be resolved in favor of reaching a decision on the merits ... and alternative sanctions should be used") (citation omitted).

■ The Court's substantive sanctions will include a preclusion order under Rule 37(b)(2)(A). The Court has already held that the formulae sought by plaintiffs are relevant and disclosure necessary for a fair trial on the merits. *Coke III,* 107 F.R.D. at 294–98. Because defendant refuses to supply that information, in the face of this Court's disclosure order, plaintiffs are entitled to the advantage of every possible inference that fairly could be drawn from the formulae evidence sought.

■ For the purposes of making formulae comparisons, plaintiffs are entitled to compare the entire formulae, and to obtain a favorable comparison of the entire formulae. Defendant may not qualify those comparisons by noting the difference in sweetener.[15] Defendant forfeited that opportunity by refusing to divulge the formulae that could put the sweetener difference into context. *See Coke III,* 107 F.R.D. at 298 ("differences in the public ingredients, including sweeteners, cannot be understood unless they are put in context through disclosure of the similarities and differences in the secret ingredients"). The Court's Order will provide plaintiffs the best possible formula context for the sweetener difference, a context that "overcomes" the difference for formulae comparison purposes.

■ However, the Court rejects plaintiffs' repeated claim that a fully effective preclusion order must be coextensive with the issues to which the withheld formulae evidence is relevant.[16] That argument sweeps too broadly. While the formulae are relevant to this litigation, it is equally clear that the formulae will not necessarily determine the outcome of this litigation: "To define a product solely by its chemical composition disregards other important

the amended bottlers demonstrated a probability of success on the merits of their contract-based arguments, *Coke I,* 563 F.Supp. at 1139–40, the facial meritoriousness of defendant's case has been established. *See Scarborough,* 747 F.2d at 875 (plaintiff's claim facially valid even if claim against one defendant could be dismissed).

13. The "history of dilatoriness" factor is most relevant with respect to Rule 37(b) motions predicated on failure to comply with a discovery schedule, *e.g., Poulis,* 747 F.2d 863; *Transportes Aereos,* 104 F.R.D. 482, rather than on a plain refusal to comply with a specific court order. Nevertheless, defendant's cooperation in other areas of discovery is some evidence that default judgment is not necessary to prevent further delay in this litigation. *See Litton Systems, Inc. v. AT & T,* 91 F.R.D. 574, 576 (S.D.N.Y.1981) (record of cooperation in other respects among factors to be considered in determining what sanction is appropriate); *cf. Transportes Aereos,* 104 F.R.D. at 509 ("There exists no sanction under Rule 37 which would serve to prevent further delay and harassment of the Court or [defendant] or that would

prompt or coerce [plaintiff] into complying with the rules of court.").

14. Because the formulae are relevant and necessary to plaintiffs' claims, defendant's failure to disclose the formulae necessarily prejudices plaintiffs. Delay and expense are also attributable to defendant's disobedience.

Examples of "true prejudice" provided by the Court of Appeals in *Scarborough,* 747 F.2d at 876, however, suggest that *irremediable* prejudice may be the real focus of this factor. *See also Ennis,* 782 F.2d at 397–98; *Litton Systems,* 91 F.R.D. at 578 (prejudice alleviated by court's reopening discovery and postponing trial). The Court's sanctions order will alleviate plaintiffs' prejudice due to defendant's refusal to comply with the disclosure order.

15. Defendant may cite sweetener differences only as provided at *infra* pages 371–72.

16. Plaintiffs' proposed preclusion order would be functionally equivalent to a default judgment. *See* Response of the Plaintiffs to the Direction of the Court at 21, Dkt. 282 (83–95), Dkt. 199 (83–120).

definitional criteria." *Coke I*, 563 F.Supp. at 1134.

It must be remembered that the ultimate issue to be decided at trial with regard to these counts is whether the syrup for diet Coke is "Coca-Cola Bottler's Syrup" within the meaning of the pertinent agreements. Ingredient identity is not necessarily the same as product identity. The formulae evidence, which could show to what extent the syrups are alike in composition, is merely one category of proof on the ultimate issue. Categories of evidence other than the formulae—such as taste identity, marketing history and strategy, consumer perceptions, and packaging—are urged by the Company as being relevant to the product identity issue. If the Company is correct in whole or in part, it may be able to overcome whatever showing could be made on the basis of the formulae evidence. *See id.; see also* Plaintiffs' Preliminary Statement of Issues at 2–10, Dkt. 224 (83–95), Dkt. 161 (83–120); Defendant's Preliminary Statement of Issues at 2–5, Dkt. 223 (83–95), Dkt. 160 (83–120); Defendant's Answering Brief at Ex. E (summary of bottlers' deposition testimony on relevance of

17. This fact, among others, distinguishes this litigation from *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51 (2d Cir.1971), *rev'd on other grounds*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), to which plaintiffs analogize. In *Hughes*, the testimony of Howard Hughes, sole owner of corporate defendant and "guiding light behind all the transactions" between the parties, was "necessary to *all aspects*" of the litigation. *Id.* at 61 (emphasis added).

Previous litigation involving the Company, *Coca-Cola Co. v. Joseph C. Wirthman Drug Co.*, 48 F.2d 743 (8th Cir.1931), is also distinguishable from the present litigation. In *Wirthman*, the Company alleged that a fountain operator was selling a substitute as Coca-Cola. The Company's proof as to the spurious nature of the cola served by defendant was composed of two conclusory affidavits by chemists who had compared various samples. Because the affidavits were inadmissible and the Company would not introduce the actual chemical analyses of its product, its suit was dismissed.

In this litigation, unlike in *Hughes* and *Wirthman*, the absence of the wrongfully withheld information can be remedied without necessarily deciding the case.

18. Both "beverage base" and "syrup" are included within the scope of this Opinion and Order.

ingredients), Dkt. 262 (83–95), Dkt. 188 (83–120).[17] In addition, defendants urge that acknowledged sweetener differences, even if presented in a context most favorable for plaintiffs, may ultimately determine the outcome of this litigation.

■ Having considered the arguments of both parties and the proposed preclusion orders submitted pursuant to the Court's request at oral argument, the Court by order will establish for the purposes of this litigation certain facts consistent with the foregoing discussion. Plaintiffs may choose to use all, some, or none of these facts. Defendant may not attempt to rebut any fact established pursuant to this Opinion.

Several general facts are readily derived from the Court's previous Opinion suggesting ways in which the formulae evidence may be relevant. It will be established, for example, that the formula for diet Coke is within the range of formulae for syrups that have been sold as Coca-Cola Bottler's Syrup[18] and that diet Coke was formulated to taste like and otherwise resemble old Coke as much as possible for a low-calorie cola.[19] Likewise, plaintiffs may choose to

*See* Response of the Plaintiffs at 4 n. 2, Dkt. 282 (83–95), Dkt. 199 (83–120).

19. The introduction of new Coke on April 23, 1985 and the reintroduction of old Coke as "Coca-Cola Classic" on July 10, 1985 adds a twist. The Company has informed its bottlers that for the present it will supply them with Coca-Cola Classic syrup under the terms of their contracts for Coca-Cola, but without prejudicing the rights of the Company or the bottlers to assert a different contractual position. Letter from Charles L. Wallace, Vice-President, to Bottlers (July 24, 1985), Plaintiffs' Supplemental Brief at Ex. A, Dkt. 239 (83–95), Dkt. 173 (83–120); Dyson Affidavit, Dkt. 234 (83–95), Dkt. 168 (83–120). In effect, the Company is reserving the right to decide at a later time that the syrup for Coca-Cola Classic is not "Coca-Cola Bottler's Syrup" within the meaning of the present agreements, and thus not subject to those agreements, even though the identical syrup undeniably was Coca-Cola Bottler's Syrup and was subject to the agreements when sold prior to the introduction of new Coke. *See Coke III*, 107 F.R.D. at 291.

It may be more important for the purposes of this litigation that the formula for diet Coke was

have established that: the formula for diet Coke is significantly more like the formula for old Coke than the formula for new Coke (or any other version of Coca-Cola) is like the formula for old Coke; the formula for diet Coke is significantly more like the formula for new Coke than the formula for old Coke (or any other version of Coca-Cola) is like the formula for new Coke; the formula for diet Coke is significantly more like the formulae for old Coke and new Coke than the formulae for any of the Company's experimental low-calorie colas are like the formulae for old Coke and new Coke; and 99% of the ingredients in diet Coke and old Coke, and/or diet Coke and new Coke, are the same.

In addition to these facts derived from the previous Opinion, plaintiffs are entitled to have established certain of the facts proposed in their preclusion order proposals, so long as the "fact" could have been directly obtained from the undisclosed formula evidence.[20] Thus, for example, plaintiffs may conclusively establish that syrups made from a wide variety of formulae have been sold over time as Coca-Cola Bottler's Syrup, and that diet Coke is much more like old Coke in ingredient composition and formulae than some earlier versions of Coca-Cola Bottler's Syrup were like each other. Finally, plaintiffs are entitled to regard as conclusively established any "fact" conceded by defendant in its preclusion order proposals: for example, that new Coke syrup is Coca-Cola Bottler's Syrup and covered by the contracts at issue, although new Coke, unlike diet Coke and all previous versions of Coca-Cola Bottler's Syrup, contains no "Merchandise 7X".[21]

The Court will also prohibit defendant, under Rule 37(b)(2)(B), from introducing designated matters into evidence. Except as outlined below, defendant may not make any further use of formulae evidence.[22] Defendant may cite the sweeten-

---

substantially like that of old Coke prior to, rather than after, the introduction of new Coke. Likewise the relationship of diet Coke to new Coke now may be more relevant than that of diet Coke to old Coke. The Court's Order permits plaintiffs complete freedom on how to approach this issue.

It should be clear that if a similar contract dispute, and similar evidentiary impasse, arises with respect to *Coca-Cola Classic*, the orders issued in this litigation would be of no effect in that litigation. Also unaffected by this Opinion and Order is the present *Elizabethtown* litigation, *Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca–Cola Co.*, 95 F.R.D. 168 (D.Del.1982).

20. "Facts" regarding taste and consumer perception, while they may appear to be beyond the scope of this order, will be included if related to past versions of Coca-Cola. Had defendant disclosed the historical formulae for Coca-Cola syrup, plaintiffs might have been able to reconstruct the various syrups and conduct taste tests upon them. These tests may have revealed that the taste of Coca-Cola changed dramatically over time and that the difference in taste between diet Coke and new Coke and/or old Coke is less significant. Taste comparisons among *current* Coca-Cola products, however, can be made and will not be established by the Court.

Certain other proposals by plaintiffs do reach too far and may not be established pursuant to this Opinion and Order. For example, the Court will not order it established that diet Coke syrup "is" Coca-Cola Bottler's Syrup, that sweet-

ener differences are irrelevant, or that a pre-1907 version of Coca-Cola Bottler's Syrup was sweetened "exclusively" with saccharine.

21. The Court recognizes that in many cases court-established "facts" may be but pale substitutes for actual facts in terms of their impact on the court or jury. In this litigation, however, it would seem that the facts established by this Opinion and Order are clearer and more effective for plaintiffs than a technical, though precise, ingredient comparison and conflicting expert testimony.

22. Plaintiffs have objected to preclusion orders proposed by the Company that refer to a difference in sweeteners, claiming that without the rest of the formulae evidence they cannot put the sweetener difference "into context." *See* text at *supra* page 369. The Court's preclusion order, however, is more favorable to plaintiffs than the Company's proposals and provides plaintiffs their best possible factual context for the sweetener difference. The Order lets plaintiffs establish that from a formula perspective "the gap between old Coke and new Coke is as wide as the Grand Canyon and that the gap between diet Coke and new Coke is perhaps as narrow as the width of a piece of paper," Transcript at 38–39 (statement of plaintiffs' counsel), but it does so without entirely removing from the case the acknowledged sweetener difference.

Reference to a letter to defendant's counsel from plaintiffs' counsel, confirming that the

er difference between diet Coke and other versions of Coca-Cola only with respect to the elements of proof alleged in its preliminary statement of issues. *See* Dkt. 223 (83–95); Dkt. 160 (83–120); Transcript at 73–82. For example, defendant may introduce the terms of the 1921 Consent Decrees, which require 5.32 pounds of sugar per gallon of syrup, and note the absence of sugar in diet Coke. *See* Statement at 3; transcript at 73; *see also Coke I,* 563 F.Supp. at 1134–36 (unamended bottlers failed to demonstrate probability of success on contract claims given absence of sugar in diet Coke).[23] Defendant could also point to the course of conduct of the parties, including the Company's alleged practice of having sold only a high-caloric, sugar-sweetened syrup as Coca-Cola Bottler's Syrup, the consistent practice of the bottlers of accepting that syrup as Coca-Cola Bottler's Syrup, and plaintiffs' interpretations of the terms of their contracts. Statement at 3; transcript at 74–75. Defendant may not, however, use formula evidence in any other manner not outlined

in defendant's preliminary statement of issues and at oral argument.

The Order accompanying this Opinion, and attached as an Appendix hereto, will set out the precise facts established pursuant to Rule 37(b)(2)(A) and will limit under Rule 37(b)(2)(B) defendant's use of formulae evidence to those uses outlined in its preliminary statement of issues. Although this Opinion and Order are intended to conclusively resolve this discovery matter and enable the cases to proceed to trial, plaintiffs may move to amend the Order at any time (including during trial) in a manner consistent with this Opinion if it becomes apparent the present Order is not sufficiently faithful to the Court's governing principle of no prejudice to plaintiffs and no benefit to defendant.

### Expenses and Fees

■ Plaintiffs have also asked the Court to award them expenses and attorney's fees incurred due to the Company's failure to comply with the Court's disclosure order.[24]

Rule 37(b)(2) expressly states:

---

parties had reached an impasse in attempting to agree on a preclusion order, may help clarify the Court's perspective. The letter reads, in part:

> [Y]ou indicated that the Company would not agree to any proposed preclusion order that did not allow the Company to argue that diet Coke syrup is not covered by the plaintiffs' contracts because it contains a different sweetener than either new Coke syrup or old Coke (Coca-Cola Classic) syrup. You also indicated that the Company would not agree to a statement in any preclusion order to the effect that the differences between old Coca-Cola syrup (now being sold as the syrup for Coca-Cola Classic) are more numerous and are more significant when that syrup, taken as a whole, is compared to the syrup for new Coca-Cola than are the differences which exist when diet Coke syrup, taken as a whole, is compared to old Coca-Cola syrup taken as a whole.

Letter from Emmet J. Bondurant to Michael C. Russ (Feb. 28, 1986), Response of the Plaintiffs at Ex. G, Dkt. 282 (83–95), Dkt. 199 (83–120).

The Court agrees with defendant's position in the first quoted sentence, regarding the sweetener difference, and with plaintiffs' position in the second quoted sentence, concerning the comparison of the syrups taken as a whole (assuming that the comparison is a formulae comparison). These two positions are not mutually

exclusive, and are accommodated in this Opinion.

**23.** Plaintiffs would be free to respond by citing the substitution of high-fructose corn syrup for sugar in new Coke and Classic Coke. The *Elizabethtown* litigation, No. 81–48–MMS, may or may not yield a definition of the term "sugar" in this context. Whether that definition will be given preclusive effect in this litigation the Court leaves for another day.

**24.** Plaintiffs' motion for sanctions included an amount for their costs and attorneys' fees "in bringing and prosecuting this action." Dkt. 254 (83–95) at 4; Dkt. 184 (83–120) at 4. Plaintiffs' opening brief does not claim expenses and fees for the entire litigation; it does, however, at least implicitly argue for an award on both the motion for sanctions and the motion to compel. *See* Dkt. 256 (83–95), Dkt. 185 (83–120) at 43–46. In its answering brief, defendant interpreted plaintiffs' brief as seeking costs and fees on both motions. *See* Dkt. 262 (83–95), Dkt. 188 (83–120) at 45. Plaintiffs' reply brief, however, states that plaintiffs seek only an award of expenses and fees incurred as a result of the Company's failure to comply with the Court's disclosure order. Dkt. 265 (83–95), Dkt. 192 (83–120) at 18–19. At oral argument, plaintiffs conceded that they had scaled back their claim. Transcript at 43–44, Dkt. 280 (83–95).

the court *shall require* the party failing to obey the order [compelling discovery] or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure, *unless* the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

Fed.R.Civ.P. 37(b)(2) (emphasis added). Because it is undisputed that the Company failed to comply with this Court's discovery order, expenses and fees must be paid by the Company unless its failure to comply was "substantially justified" or other circumstances make the award unjust.[25]

■ The Company will be ordered to pay the expenses and fees. The Court is wholly unimpressed by the Company's explanations for its failure to obey the discovery order. While the Company was justified in attempting to protect its trade secrets during discovery and in contesting plaintiffs' motion to compel, this Court's decision and order of August 20, 1985 put an end to that dispute. The Company is not "substantially justified" in willfully defying a court order, notwithstanding its continued belief in the correctness of its position. Accepting the Company's argument on this matter would eviscerate the costs and fees sanction of Rule 37(b)(2), invite continued argument on an issue already decided, and seriously undermine the authority of the Court. The Company will be ordered to pay the Bottlers their reasonable expenses, including attorney's fees, caused by the Company's failure to obey the Court's discovery order.

*Conclusion*

The Court's previous Opinion in this litigation noted an order to compel disclosure of the Company's secret formulae could be "a bludgeon in the hands of plaintiffs to force a favorable settlement." *Coke III,* 107 F.R.D. at 290. The Court now declines to wield on plaintiffs' behalf the ultimate bludgeon in this litigation, default judgment, when careful use of a scalpel is far more appropriate. In the accompanying Order, the Court will establish certain facts regarding the various formulae and strictly limit defendant's use of formulae evidence for the purposes of this litigation. In addition, the Court will order defendant to pay the reasonable expenses and attorney's fees incurred by plaintiffs in prosecuting the motion for sanctions. Hopefully, the litigants will be able to amicably resolve payment of attorneys' fees and costs. If they cannot, an appropriate motion should be filed within thirty days of issuance of the accompanying Order.

## APPENDIX

### ORDER

At Wilmington this 23rd day of May, 1986, for the reasons expressed in the accompanying Opinion,

IT IS ORDERED THAT:

1. Plaintiffs' motion for sanctions is granted in part and denied in part.

---

Plaintiffs' retrenchment is well advised. While the language of Rule 37(a)(4), relating to the award of expenses and attorney's fees on a motion to compel, does parallel that of Rule 37(b)(2), the application of the provisions differs significantly in this case. The discovery dispute here was genuine; the Court has no doubt that legitimate trade-secret concerns motivated the Company prior to the Court's disclosure order to refuse to disclose the information sought by plaintiffs. *See, e.g., Derry Finance N.V. v. Christiana Cos.,* 102 F.R.D. 892, 897 (D.Del.1984) (reasonable arguments of privilege and relevance). In fact, the Court upheld the Company's position with regard to the formulae for TAB, caffeine-free diet Coke, and sugar-sweetened experimental cola beverages. *Coke*

*III,* 107 F.R.D. at 300. Even though it did not prevail on the bulk of the issues in dispute, the Company was "substantially justified in carrying the matter to court." Rule 37(a)(4) advisory committee note. Expenses and fees thus should not be levied against the Company on the motion to compel.

25. This is not a case in which attorney negligence or willfulness was responsible for the failure to comply. On the contrary, it was the Company's deliberate decision not to obey the order. *See supra* note 10. The Company's counsel, therefore, will not be required to pay expenses and fees.

2. Pursuant to Fed.R.Civ.P. 37(b)(2)(A), it is established for the purposes of this litigation that:

(a) the formula for diet Coke syrup is within the range of formulae for syrups that have been sold as Coca-Cola Bottler's Syrup;

(b) diet Coke was formulated to taste like and otherwise resemble old Coke as much as possible for a low-calorie cola;

(c) the formula for diet Coke is significantly more like the formula for old Coke than the formula for any other version of Coca-Cola, including new Coke and caffeine-free Coke, is like the formula for old Coke;

(d) the formula for diet Coke is significantly more like the formula for new Coke than the formula for any other version of Coca-Cola, including old Coke and caffeine-free Coke, is like the formula for new Coke;

(e) the formula for diet Coke is significantly more like the formulae for old Coke and new Coke than the formulae for any of the experimental low-calorie colas developed by the Company are like the formulae for old Coke and new Coke;

(f) 99% of the total number of ingredients in diet Coke and old Coke, and in diet Coke and new Coke, are the same;

(g) the term "Coca-Cola Bottler's Syrup" as used in the 1921 Consent Decrees and as used in the perpetual contracts between the defendant and the plaintiffs has included a wide variety of different syrups made with different ingredients having different tastes according to the different formulae, all of which were manufactured by the defendant and sold to the plaintiffs as "Coca-Cola Bottler's Syrup" under their perpetual contracts between July 21, 1899 and the current date;

(h) the differences in the ingredient compositions, chemical compositions, formulae, and tastes between some of the earlier versions of Coca-Cola Bottler's Syrup which the defendant manufactured and sold to bottlers as Coca-Cola Bottler's Syrup between 1889 and 1980 and other versions of Coca-Cola Bottler's Syrup which it manufactured and sold to bottlers during the 1899–1980 period were greater in number, greater in magnitude, more significant, and more noticeable to consumers than any such differences which exist between the syrup for diet Coca-Cola and the version of "Coca-Cola Bottler's Syrup" which defendant was manufacturing and selling to bottlers under their contracts during the period 1980 through April 1985, immediately prior to introduction of new Coca-Cola;

(i) the ingredient differences between diet Coke syrup and Coca-Cola Classic syrup are less significant between the two syrups as a whole, involve fewer ingredients and less significant ingredients from the standpoint of the ingredient composition, chemical composition, and formulae than the ingredient differences which exist between the syrup for Coca-Cola Classic and the syrup for new Coca-Cola, which was introduced by defendant on August 25, 1985, and has been sold by defendant as "Coca-Cola Bottler's Syrup" within the meaning of its contracts with plaintiffs since that date;

(j) prior to the defendant's introduction of new Coca-Cola syrup in April, 1985, all of the syrups which defendant formulated and sold to bottlers as "Coca-Cola Bottler's Syrup" to produce a carbonated soft drink that used the Coca-Cola or Coke trademarks, including diet Coke (and with the exception of caffeine-free Coca-Cola), shared the following attributes:

(1) they were caramel colored.

(2) they were "colas."

(3) they were sold for the purpose of being mixed with carbonated water, sealed in a bottle or can, and sold under the trademarks Coca-Cola or Coke for consumption as a beverage.

(4) they contained Merchandise No. 5, which is a flavoring compound composed of oils extracted from cola

leaves and extracted from kola nuts; Merchandise No. 5 has been used by defendant in every version of "Coca-Cola Bottler's Syrup" produced since 1899.

(5) They contained Merchandise 7X, which is a secret blended emulsion of flavor oils which constitutes the core of the Coca-Cola formula, the only unique and distinctive and significant part of Coca-Cola syrup, the source of the unique and distinctive taste, aroma, mouthfeel, and other organoleptic properties of Coca-Cola that distinguish Coca-Cola from competing soft drinks such as Pepsi Cola; the defendant has used Merchandise 7X without change in every version of Coca-Cola Bottler's Syrup manufactured and sold to bottlers under the terms of their contracts from 1899 until the current date, with the exception of caffeine-free Coca-Cola syrup which contains a modified version of Merchandise 7X and new Coca-Cola syrup which contains no Merchandise 7X.

(k) caffeine-free Coca-Cola syrup is the same from the standpoint of chemical composition, ingredient composition, and formulae as the syrup which the defendant was selling as "Coca-Cola Bottler's Syrup" during the period 1980 through April 1985 (and which the defendant is now selling as Coca-Cola Classic syrup), notwithstanding the fact that the caffeine-free Coca-Cola syrup does not contain (1) kola nut extract, (2) caffeine, (3) extract of vanilla, all of which have been ingredients in every previous version of "Coca-Cola Bottler's Syrup" manufactured and sold by defendant to the bottlers under their contracts from 1899 to the current date, and (4) that caffeine-free Coke uses a modified form of Merchandise 7X.

(*l*) With respect to diet Coke syrup:

(1) diet Coca-Cola syrup contains the identical quantities of Merchandise 7X, Merchandise No. 5, extract of vanilla, and caffeine as the syrup which defendant formulated and sold to plaintiffs and other bottlers as "Coca-Cola Bottler's Syrup" during the period from January 27, 1980 through the end of April 1985 (which is the same syrup that defendant is now selling to plaintiffs under the name "Coca-Cola Classic" syrup) and that defendant used these ingredients in diet Coke to match the taste, aroma, mouthfeel, and all other organoleptic properties of the bottled Coca-Cola as it existed during that period.

(2) defendant modified the publicly-disclosed ingredients in diet Coca-Cola to compensate for the use of a different sweetener and to make diet Coke taste as close as possible to old Coca-Cola.

(3) differences in formula, chemical composition, ingredient composition, taste, and other physical organoleptic properties between diet Coke syrup and the syrup which defendant sold as Coca-Cola Bottler's Syrup between 1980 and April 1985 (and which defendant is now selling as Coca-Cola Classic syrup) are much less significant, much fewer in number, and much less noticeable to the consumer than:

(i) those differences between Coca-Cola Classic syrup and the earlier versions of "Coca-Cola Bottler's Syrup" that the defendant had formulated and sold to bottlers under their contracts between 1899 and the current date;

(ii) those differences between the syrup for new Coca-Cola which was introduced by defendant in April 1985 and all previous syrups which the defendant has sold to bottlers as "Coca-Cola Bottler's Syrup" under their contracts;

(iii) those differences (except taste and physical organoleptic properties) between the syrup for caffeine-free Coca-Cola and the syrup for Coca-Cola Classic; and

(iv) those differences between some of the versions of Coca-Cola Bottler's Syrup manufactured and sold by defendant between 1899 and 1980, and other versions of Coca-Cola Bottler's Syrup sold by defendant to bottlers as "Coca-

Cola Bottler's Syrup" during that period.

(m) the syrup for "new Coca-Cola," which was introduced by the defendant in April, 1985, is "Coca-Cola Bottler's Syrup" and is encompassed by plaintiffs' contracts with the defendant, despite the fact that the syrup for new Coca-Cola is produced by an entirely new and different formula, with materially different ingredients (including secret ingredients), a materially different flavor profile, and a materially different taste than the version of "Coca-Cola Bottler's Syrup" that was being produced by the defendant and supplied to the plaintiffs under their contracts immediately prior to the introduction of new Coca-Cola syrup; and that the syrup for new Coca-Cola also materially differs in all of the respects enumerated above from any earlier version of "Coca-Cola Bottler's Syrup" which defendant has ever produced and is materially different from an ingredient standpoint from any of those earlier syrups. The ingredient differences between new Coca-Cola syrup and the version of Coca-Cola Bottler's Syrup which the defendant was selling to plaintiffs as "Coca-Cola Bottler's Syrup" from 1980 through April 1985, and which was replaced by new Coca-Cola, are major and material and include the following:

(1) new Coca-Cola syrup is produced according to a new formula that is not a modification, extension, or improvement of the original Coca-Cola formula;

(2) new Coca-Cola does not use Merchandise 7X, the emulsion of secret ingredients which is the core of and the most significant part of the original Coca-Cola formula, and which was used without change by defendant in every previous syrup produced by defendant that has used the Coca-Cola or Coke trademarks since the formula for Coca-Cola was first developed in 1886, including diet Coca-Cola, but excluding caffeine-free Coca-Cola, which contains a modified form of Merchandise 7X;

(3) none of the secret ingredients in new Coca-Cola are common with the secret ingredients in Merchandise 7X or Merchandise No. 5; and

(4) the use of different secret ingredients in new Coca-Cola gives new Coca-Cola a flavor complex, "flavor profile," and taste that is materially different from the flavor complex, profile, and taste of the version of "Coca-Cola Bottler's Syrup" which is sold to bottlers from 1980 through April 1985 (and now sells as the syrup for "Coca-Cola Classic"), and all of which are major, significant, and give new Coke a significantly different taste.

(n) except for the different sweeteners, the bottle syrup sold by defendant to the bottlers in the United States for the production of bottled diet Coke contains precisely the same ingredients, in identity, number, and quantity, as the bottle syrup sold by defendant to the bottlers in the United States for the production of:

(1) Coca-Cola (made according to the new formula introduced in April, 1985); *and/or*

(2) Coca-Cola Classic (made according to the original formula); *and/or*

(3) caffeine-free Coca-Cola.

(*o*) defendant intended to formulate diet Coke to duplicate as closely as possible the taste and appearance of:

(1) Coca-Cola; *and/or*

(2) Coca-Cola Classic; *and/or*

(3) caffeine-free Coca-Cola.

(p) the secret ingredients in Coca-Cola *and/or* Coca-Cola Classic are identical to the secret ingredients in diet Coke and are used in the same relative quantities;

(q) in selecting the final formula for diet Coke bottle syrup from among various experimental diet cola formulae developed by defendant, defendant chose the formulation that would impart a taste and appearance most like the taste and

appearance of Coca-Cola *and/or* Coca-Cola Classic;

(r) defendant had developed several formulae for a low-calorie cola product sweetened with saccharin and aspartame in 1978 at the time defendant was drafting the 1978 Amendment.

The foregoing established facts are available to plaintiffs at their option and may not be contested by defendant.

3. Pursuant to Fed.R.Civ.P. 37(b)(2)(B), defendant is precluded from making any further use of formulae evidence in this litigation, except as alleged as an element of proof in its preliminary statement of issues (Dkt. 223 (83–95); Dkt. 160 (83–120)).

4. Pursuant to Fed.R.Civ.P. 37(b)(2), defendant shall pay plaintiffs' reasonable expenses, including attorney's fees, incurred due to defendant's failure to obey this Court's discovery order of August 20, 1985. If the parties cannot agree as to the amount of those expenses, plaintiffs should file an appropriate motion within thirty days of the issuance of this order.